222147, Avago Technologies v. Netflix Good morning, Your Honor. May it please the Court, Dan Young for Avago Technologies. In its final written decision, the Board improperly construed the quality level terms to include not only the quality level of the digital media content, but also the quality level of the network connection. And this broad interpretation or construction goes against the intrinsic evidence of the case, including the prosecution history, the specification, and the claim language itself. When these- It's just to be clear, it didn't say that either one of those independently could suffice, right? It just said that the quality of the process of getting the content to the endpoint might be a factor in the ultimate quality of what is received. The quality level of the digital media content, Your Honor. The Board specifically said, we do not agree with Pat and Oner that the claimed quality levels are limited to the quality of the digital media content independent of network connections. So as the claims were originally filed, these were filed in relation to the quality level of a digital media service. And when those claims were initially proposed, the examiner rejected them over a system where the user was receiving voice data over a connection, and if that connection was bad, that we would switch over to voice data or digital media content to a better connection, and that would then improve the digital media service. And in response to that, the applicant amended the claims in four specific ways. They left digital media service in the preamble, but everywhere else in the claim, and this is shown on appendix page 168, every other place where it said digital media service, service was struck, and a more narrow term, content, was added. So instead of talking about the quality of the digital media service as a whole, those quality levels talked about the quality of the digital media content. But doesn't it also talk about the current quality level? And doesn't that mean current being during delivery? How do you respond to that? Which was one of the grounds, one of the reasons that the board identified for why it arrived at the construction it arrived at? Yeah, sure, and there's a number of reasons for that. One of the things that the applicant did during prosecution is that not only changed service to content, but it added two limitations. It added a using limitation and a second delivery limitation. And so what the using limitation says is, we are going to use the network connection to obtain the higher quality digital media content. Once it's obtained, we are then going to deliver that content to the user. So one of the problems with the board's construction is it takes those two limitations and it eliminates the second one. It says as soon as you are getting the content, you are then also then delivering it. They read it as one, they call it the whole limitation, limitation 1D. And that is in contrast to what the specification says, where it says higher quality information and their expert, Netflix's own expert admitted that information can include content. It says, and this is on appendix page 35, column 6, 25 through 30, it says higher quality information is of little value if the communication network is slow. And so what it's saying is, if you have, and they use different examples, and figure five is used as an example in the specification throughout the entirety of the specification. And what that says is, in this particular example, and again this was filed a long time ago, you had a PDA and say you were receiving voice music in like an MP3 format, and you didn't have large file sizes because you were worried about storage, and you were listening to it, it was being delivered to the user, and there's no network connection there, it's just on the, in this case, on the hard drive of the PDA. And then it says, well, we have a connection with another system, and that system has CD quality. This is the example used in the specification. And if that network connection is high enough, if we can grab it, then we're going to let the user listen to a higher quality of content, the CD quality content in that example. And the board, I'm sorry, throughout the entirety of the specification it talks about quality of information versus a network connection. Now, this claim still, as amended, still talk about a digital media service, and that service includes considerations of network connection. What about the current quality level, the question Judge Stoll asked? I'm not sure I understand the answer. Doesn't current quality level just necessarily imply you have to take account in some way for how it's being delivered, i.e. the network connections? Well, no, Your Honor, that's why I was saying those two limitations, the using limitation and the second delivery limitation, those are two separate limitations. They deal with different things. And the way these claims are written, you obtain the content, and then you deliver it. So the current content, as currently delivered, as the specification talks about, the delivery is through, as an example, if you look at column 855-64, it deals with the user interface devices, like the screen, the keyboard, the mouse, that's how it's being delivered. So it's currently to be delivered, in this case, in the example I gave, in a lower quality format, it's currently to be delivered, they're currently listening to a lower quality song, in this case, and then it's evaluating, can I get a better connection to a system where I can get a higher quality? And then if I can obtain it, that's what the using limitation says, if I can obtain it, then I will then deliver it. So the current delivery of the content is talking about the content itself. It's not talking about the service, because if it was talking about the delivery of the service, or the current delivery of the content, that would be exactly how the claims were originally written. Let's come back to that, the prosecution history and the distinction of Jagadeesh. Isn't it a problem for you that there were, as you say, four different amendments made, and as far as I can tell, there's no discussion about why the amendment from service to content was made. Isn't this at best ambiguous and not particularly helpful to your proposed construction? No, Your Honor, I would disagree. On appendix page 175, it talks about, the applicant gives kind of a lengthy description as to why the claims were amended. And what they say is, as a whole, Jagadeesh fails to disclose or suggest obtaining voice data from a second source. Now that second source is another limitation added. But then it says, let alone obtaining digital media content at a higher quality level from the second system. There is the amendment from a higher quality digital media service to a higher quality digital media content. That's the narrowing of the claim. And then it says, as such, Jagadeesh also necessarily fails to teach, disclose, or suggest delivering the digital media content at a higher quality level to the user, instead of the digital media content at the current quality. That's the second delivery limitation. So it says, if you're not obtaining it, then you certainly can't deliver it. So the applicant gave three distinct reasons as to why these claims were narrow and get around Jagadeesh. And the first one is obtaining from a second source. That's what the board relied on to distinguish the file history. But the board did not address the second and third reasons, which were that you're not obtaining the higher quality level, you know, an example of CD quality versus an MP3 quality, as an example, or an HD version versus an HD version of a movie. And then obviously if you can't obtain it, then there's no way to deliver it. And so the using and delivering limitations are two separate. You can have a high enough bandwidth to grab a CD quality or an HD version of a movie. But if you're watching it on a phone that doesn't have an HD screen, you can't deliver it to the user. And their expert agreed that delivering it, what delivering means is presenting the content in a form that the user can use. It doesn't do you any good to obtain an HD movie if you don't have a screen that will show an HD quality of a movie. That's why those two limitations are different. And that's what the applicant is saying here, that you're doing it, you have three different reasons why these claims are narrowed and get around Jagadeesh. And they repeated that because Kamiah is another reference that they used, the examiner used in the prosecution history. And this is on the bottom of page 175. And it says Kamiah like Jagadeesh relates to selection of a communication medium, again that's the network connection, and fails to disclose, tease or suggest obtaining digital media content at a higher quality level from the second system as recited in the amended claim. In this case it was claim 38, but that became claim 1 that we're discussing now. So the applicant says there twice, the prior art that the examiner was using was talking about changing the network connection, but not the medium, not the content itself. And this is important because if you look at the prior art that's asserted in this case, the Shaw reference, that's a situation where you have a content, you have a CDN, content delivery network, and what happens is in that prior art you get content into an entry point, this is in figure 2, you replicate that content throughout a whole number of servers throughout the network. And what you're doing there is you're taking an identical copy of a show as an example, and you're putting it throughout the network so that the user who's going to be using that movie is in the closest proximity, so you have a shorter distance. And that was the whole idea behind that prior art. I have a question. Is there anything from the, given that there were four different reasons for the amendments, is there anything from the patent examiner, for example, by way of reasons for allowance that might support that the examiner understood the way you're interpreting the claims now could be important to the reason that the patent was allowed? Yes, Your Honor. When the examiner allowed the claims, the examiner said, for the reason set forth in the response. In other words, the reason set forth by the applicant. For multiple reasons. Yes, Your Honor. But again, if you, if the only reason why the claims were narrowed was because it came from a second system, then that's all they would have had to have done. They could have just amended it and said, digital media service from a second system. But they went and they narrowed it substantially more than that. And they did it for, because the media system, the media service as a whole, will absolutely improve when you switch to a better connection. But you're not going to get a higher quality digital content. And that's why the way the board construed it allowed Shaw to come into the scope of the claim. Because Shaw teaches the same exact content replicated throughout the various servers so that you might get a better connection, but you're not going to get better content. Isn't Shaw's thinning within the scope of the claims as you would have them construed? No, Your Honor. Both experts said that the thinning relates to the degradation in the bandwidth of the connection. So in other words, you have... But I thought it may relate to that, but I thought it was basically deleting frames or certain portions of the content itself. Maybe you did it because you have bandwidth limitations. That may be your motivation, but what you're actually doing is degrading the content, isn't it? That's before it's sent out. That's the result. And that's the same thing that the prior art in the Jagadeesan case has, where you have the voice data is being degraded by the network connection. So you're switching to a better connection. And that's the same thing that's going on in Jagadeesan. I'm sorry. Yes, Your Honor. You might be talking past the question. My understanding, correct me if I'm wrong, of the thinning is that there's a source with a fat content. That source looks at the network that's about to send something down and says, very constrained. I can't send the fat content. So before I put it out on the network, I'm going to thin it so there's less to send. Is that an incorrect description of what this thinning is? Partially, Your Honor. The frames are being dropped as they're being sent. So then the network connection, and the reason for that is if the network connection then goes up, then it's going to start sending all the frames again. But the content is the same. The movie or the picture, the standard is the same. It's not like you're taking, in this case, an MP3 file and you're changing it down to a lower level and then sending it. It's the same file. It's just being, the frames are being parsed out because the network connection is bad. It's exactly the same thing that's going on in the prior art in a voice context. But do all the frames get sent when you thin? No, Your Honor. Then how can it be the same? Well, it's not, Your Honor. In this case, the digital media service is degraded because you're not having the network connection. It's not as good. But the content is not being, is still, when you look at the content at the source and at the end, that content is the same content. It has to be thinned because of the network connection. As soon as the  If we could look at the content at the level of the frames, it's not the same. There's more at the output end than at the received end. Yes, Your Honor. So why isn't that lowering the quality of the content even if we were to adopt your construction? Well, because the, because what's, simply put, the content is being degraded because of the network connection, not because of the content itself. And that is exactly the reason why the claims were amended. And in this case, what would happen, the way these claims would be applied to that, is you would do the determination. You would say the connection is not high enough, and you wouldn't try to obtain that content to begin with. And, Your Honor, I know I don't have much time left, but I'd like to save the rest of my time for rebuttal. Well, you're actually over your time, but we will restore some rebuttal time. Thank you, Your Honor. May this please the Court. Harper Batts on behalf of Pele Netflix. I'd like to discuss two issues with you today. First, the claim construction of quality level under a Phillips analysis, and then the second is this alternative basis for affirmance based upon the thinning teachings of Shaw. I'd like to start with the second one that you were just discussing with opposing counsel. It's clear from the final written decision, I'd like to actually just go straight to the final written decision, on pages 16 and 17 of the appendix, that the final written decision not only concluded that we are correct as to the construction of quality level, but also that Shaw's thinning results in the content quality being reduced before the digital media is placed on the network. And I'm specifically referring to the last sentence on the bottom of 16, where it says we agree with Petitioner that when a server is thinning a stream, the quality of the digital media content being delivered, provided, or obtained is reduced before the digital media content is placed on the network. And it cites specifically to our reply arguments in our sections of Exhibit 1011, where we address this issue. The way that works, do you agree with at least what I understood Mr. Young's description to be? That at the source, there is a fat content, high quality, just lots and lots of bits, and it's essentially just being filtered at the exit door, so that that goes out, but it's not as though when that's done, there is now at the source, a new thinner version in memory. So I disagree with that. The record is clear, and both experts agreed that the file was actually smaller before it's sent, because similar to what Judge Stark was saying, you actually are removing frames from the file prior to the transmission. Right. What you just said is completely consistent with my description. Okay. What Mr. Young said is, it depends what you mean by before it's sent. He said that frames are being dropped at the exit door, so that less is going out. I think that's an accurate description. So it is, but that is before it's being sent over the communication network. But the thinning is going on as each frame hits the exit door. It's not collectively, even in chunks, being thinned before. Actually, the experts discussed, both experts discussed that the thinning, it actually results in a smaller file size, as both experts agree. Well, of course it results in a smaller file size at the far end of the transmission. Of course it does. I'm just trying to understand whether a smaller file is produced at the sending end, that it exists after this process of sending it. Yes. And I would point to a response brief at page 55, and appendix 357, or declaration at 72, and their experts declaration, which is appendix 870 and 871, paragraph 69. So that is true. And I do think that goes to the point of, for whether the claim construction even matters here, we have the thinning occurring before the transmission. So while Shaw has what is called identical copies of the content at different locations, before the content is sent, a lesser version of the content is actually being transmitted. So I do think that's an alternative basis for affirmance. Can I ask you, at page 35 of the blue brief, I guess it's the end of their summary of the argument, they say the board had to ignore deposition testimony from your own expert that the concept of thinning concerned the transmission of digital media content over a communication network, and not the quality of the digital media content itself. So they're accusing the board of ignoring that your own expert directly contradicted your position. What's your response to that? I don't think so. I think if you review our expert's testimony, it's clear they're mischaracterizing that testimony. He was consistent in explaining how thinning results in frames being reduced at source before being transmitted out, and that the copy of the file is therefore smaller before transmission. Is it true that in Shaw the reason for the thinning is due to network issues? Yes. So I guess that's the issue I wanted to hit. Because plaintiff's counsel is somehow arguing that because the reason for the thinning was the problems with the communication channel, that somehow negates what is required for the claim. The claim doesn't say what a cause would be for the quality level being two different servers. Whether or not it's because of a communication network struggling, that's irrelevant to the claim that's drafted. So the causation of what results in the teaching is not relevant for whether it satisfies the claim. Your view is that it could be either cause. It doesn't matter. And the problem with the quality, the current quality level, could be because of the original source or because of something in the service provided. Yes. Do I understand that correctly? Yes, correct. And going to that claim construction issue, I think it's notable that plaintiff's counsel or appellant's counsel immediately shifted to discussing the file history. With Phillips analysis, we should be looking at the claim language, then the specification, then the file history. And if we look at the claim language, we have clear language that's talking about the obtaining or the delivering of content, not the content alone. And then I do want to touch on the specification. Are you focusing on that it's part of the delivering step and also the bandwidth limitation? Yes. And the obtaining is tied to the bandwidth. So obtaining is pulling it over the communication network. We agree with appellant's counsel that delivering is actually the displaying of the media at the device of the user. So I don't think, I think the board correctly explained that it wasn't conflating the two principles. The board specifically said we are treating these as separate limitations, but they are still satisfied. And if we look at appellant's brief at page 56, what I think it's notable is at the bottom of page 56 and the top of 57, while they say quality level has to be just basically the encoding on the source server for their claim construction, at the bottom of 56 and the top of 57, they specifically say that the processing capability of the user's device provides the higher level of quality to the user and not the network connection. So they're providing another example. They're broadening their own construction to say, yeah, you would look at for quality level, you'd look at the capabilities of the user's device, but not the communication network. So they make this arbitrary cut as to what would be the scope of the claim that's not even supported by their own briefing here. And I'd like to turn then to the specification, specifically column five. So figure one was discussed by both parties. And column five and six discussed figure one. And if we see throughout column five and six, there are various discussions of different aspects that would affect the quality level being received or provided to the user. And so, for example, I would go to column five, line 27 through 31. It talks about the first and second system may utilize information to determine whether utilizing various resources of the second system will result in the current service being provided to the user at a higher quality level than the communication protocols at the end of that paragraph are one of the factors that would be used to determine whether the quality level is higher. And then if we switch over to column six, as we briefed, we explained how they also talk about access being an aspect of quality level. So column six, starting at line eight and going through 30, and I'll specifically direct you to line 17. As another example, such higher quality information may include information to the second system has access into which the first system has no access. So even access was being used as a consideration for quality level, not just the encoding of the data. And that's also consistent. I want to go to the file history because I do think if we go back to the file here, the only discussion about the distinguishing of Jagadeesan is the top paragraph, the full first paragraph of appendix 175. And if you actually read the paragraph in order, rather than just jumping to the portion that a poet tries to rely upon, it's clear that they distinguish Jagadeesan based upon the fact that Jagadeesan was going to a single source. It was using two links, but it was going only to one server to collect that information. So it specifically starts with a sentence explaining the communication links. The next sentence then says, however, though Jagadeesan may disclose a mobile station switching between communication links based on link quality, the source of the content transmitted across the communication links remains the same, i.e. no second system. And then it goes on and it says, indeed, and explains that confirming basically that it's only looking at one link or one source. And then the next sentence, this is what I think it goes back to, what is the intent? They keep on trying to say what was the intent of the applicant versus what was actually argued. They say that is, comma, in Jagadeesan, comma, prior to transmission by either the LAN or the cellular network, the voice data is the same. Again, talking about a single system versus two systems. So then they go, as a whole, it just fails to disclose data from another source. So again, they're arguing about not from another source. I'm sorry, but that is sentence? It doesn't say the source of the data, voice data is the same. It just says the data is the same. That is correct. Okay. So that sentence doesn't, in fact, make the two different sources point. I think it does because it's still maybe not as clear as I'd like, Your Honor. So maybe there are multiple interpretations, I guess, under the case law here that you could argue. But I think when you look at it in the progression that it's being argued by the applicant, I think that within the context of the full paragraph when you read it, it's clear, or at worst, ambiguous as to the intent of why did they make all these amendments. And when appellant's counsel was asked about, well, what did the examiner say about this? It was only boilerplate language. It was the standard boilerplate language for the reasons that the applicant gave were granting the claims. They provided no further clarity. The examiner provided no further clarity as to why granting the claims beyond the amendments. What about the rest of that sentence which your friend emphasized, the let alone obtaining digital media content at a higher quality level? Sure. So I view that as, think about it if you're accused of going 90 in a school zone with your car, right? If you can say I wasn't driving a car, then that ends the discussion. And then they just add in, well, I wasn't driving a car, let alone I wasn't driving 90, let alone I wasn't in a school zone. So the fact that they're using that language, that language is only, again, repeating the claim language. And that claim language still, I would point out, still is talking about obtaining, let alone obtaining digital media content at a higher quality level, or suggests delivering the digital media content. So even here, they're still referring to the actual transmission of the data, not just the underlying content alone. Can you return to the point that we were discussing at the beginning? I want to understand better than I do what in the Joint Appendix supports what I think you said, that is, this all has to do with thinning. And I'm trying to distinguish two processes that I'm imagining as possible and understand what the record says about which takes place. The one that Mr. Young suggested, as I understand it, is that frames are being deleted at the exit door so that there does not exist at that source a thin version of the content. But what you're sending out is, of course, a shrunken version of that, but it's being shrunk at the exit door. The alternative version, which I think you said the expert testimony supports, is that at the source, there is a process called thinning. It creates a file, an actual file, maybe in buffer or something, that is thin, and then that degraded quality file is sent. You pointed to, I forget what page it was. Well, to clarify, Your Honor, I think you're correct in the first instance. It is reducing the frames, so it's pulling out frames before the transmission. It is not creating an actual separate file at the source. Okay. That could make a difference for whether or not the board's findings about thinning are supported in a way that would satisfy the claims even under the other side's construction. I don't believe so, Your Honor, because if we go back to the language and what the board determined, the question for the claim language is whether the digital media is being delivered, provided, or obtained is reduced before the digital media is placed on the network. So it's about whether before it's on the network and on the communication bandwidth is being taken into consideration, whether it's being reduced. And that's the fact that both parties are in agreement. No further questions. Thank you, Your Honors. Thank you. Thank you, Your Honor. I'll try to rapid fire through these. Sometimes that's not helpful. Okay. Thank you, Your Honor. The first issue is there is no evidence that there is an actual file created at the source that is a lower quality, and then it is then sent. And the reason for that is just... We're talking about thinning. Yes, Your Honor. Can I ask a question just to make sure I understand your point? You're saying, I think, that if it's thinned or reduced, it's not before the data is placed on the network. It's as it's placed on the network. Exactly. Do I have that right? Exactly. And if you look at... And both experts agree. If you look at Appendix 357 and then Appendix... That is their expert. And then 870, that's our expert. They both agree. And I'll just read a portion. I don't... You're better off spending your time... Okay. Thank you, Your Honor. But there's no evidence... And it wouldn't make any sense. You wouldn't create a separate file of a lower quality to then send it up because the bandwidth can change dynamically. That's why you thin it as you go. We understand. Okay. Thank you. And they had a point about page 56 of our brief. And we were talking about processing capability. What that part of the brief talks about is the delivery limitation. As part of the evaluation step, they'll send information back and forth between the two you know, what kind of... Because that's... What kind of processing capability you have. Because if you have low processing capability at what's being delivered to the user, that device, well then you can obtain the content, but you can't deliver it. So that's what that's talking about. It's not talking about the quality level of the media content itself. It's talking about how can we deliver it. And their expert says delivery is how it's presented to the user. So just to be clear, so there's obtaining is what the PDA does from the computer. Delivery is what the PDA does to the ear. That's exactly right. And then as Netflix Council was talking about, you know, in talking about figure one and talking about what was discussed in the patent, you'll notice that when it's talking about the network connection information within the patent itself, it's talking about the service as a whole. We've never taken the position that the digital media service has no considerations of bandwidth. It absolutely does. It's part of the determining limitation. It's part of the using limitation. So the bandwidth relates to the service. And that goes back to the claim construction issue and how the claims were amended during the prosecution history and how you went from a system that was talking about quality levels of the service as a whole. In this case, I'm receiving the voice data. This is the Jagged Decent reference. I'm receiving the voice data, but I'm getting it over a bad link, a bad network connection. It's coming in unclear. I'm going to switch to a better connection, same voice, but then so the quality of the service is maintained. And notice I'm out of time, Ron. Thank you. Thank you to both counsel. Case is submitted.